Toothe *v.* Bryce.

---

# WILLIAM TOOTHE

*v.*

# WILLIAM BRYCE.

1. Complainant contracted to purchase from defendant, and defendant contracted to convey to complainant, a tract of land, part of a larger tract owned by him, by deed to be delivered and the price paid at a future day, and at a place distant from the premises. At the date of the contract, and thence until it was executed, there were upon the premises conveyed, a dwelling, stable, and green-house, the two latter of which were supplied with two continuous streams

Toothe *v.* Bryce.

of water forced up through an underground pipe from two hydraulic rams driven by the waters of a spring on the part of the land retained by defendant. This feature was seen by complainant, and formed an item of value in his estimation of the property. Nothing was said at any time between the parties as to this flow of water. The defendant gave orders to his employe on the premises to stop the flow of water on the morning of the delivery of the deed, and he stopped it at the stable about ten o'clock, and at the green-house about three o'clock. The deed was delivered at eleven o'clock. *Held,* that the flow of water so driven up by the rams was an apparent and continuous easement, which passed with the land conveyed as necessary for the beneficial use of the premises, and with it, as a secondary easement, the right to enter upon the land retained to repair and maintain the rams, and that the defendant did not alter complainant's rights by stopping the flow at the barn just before the delivery of the deed.

2. The authorities on this branch of the law examined, and the soundness of the rule established in this state questioned in two respects—*first,* that the easement will be reserved by implication where the *quasi*-servient tenement is conveyed and the *quasi*-dominant is reserved, in any case except that of absolute necessity, as in case of a way; *second,* that where the *quasi*-dominant tenement is conveyed and the *quasi*-servient tenement is reserved, the presence of any degree of necessity is requisite in order that the easement should pass. *Semble,* that in this last case the weight of authority and reason is that, if the apparent and continuous easement forms a part of the tenement conveyed and adds to its value for use, it passes with the conveyance.

On order to show cause why an injunction should not issue.

Heard upon bill and answer and accompanying affidavits.

The complainant, by his bill, seeks to establish and protect his right to the benefit of a flow of water to his premises from the defendant's premises, through two several pipes laid underground and forced up by two hydraulic rams, situate, with the spring that drives them, on the defendant's premises.

The facts as they appear in the pleadings and affidavits, or are admitted by the parties, for the purposes of this motion only, are as follows: Before and on the 13th of April, 1892, the defendant was the owner of a tract containing about forty-five acres, which comprised both tenements, situate in Madison, Morris county, New Jersey, and on that day entered into a written contract with the complainant, by which the defendant, in consideration of $13,000, agreed to sell and convey to com-

Toothe v. Bryce.

plainant, and complainant agreed to purchase and pay that price for the tract in question, consisting of forty-five acres and twenty-three one-hundredths of an acre, excepting thereout a house and barn and lot whereon they stood, containing one acre, the deed of conveyance to be delivered and the purchase-money paid on the 13th day of May, at eleven o'clock in the morning, at a specified place in New York city.

At the date of the contract there were upon the whole tract two dwellings, two barns, and a green or hot-house, a spring of water and two hydraulic rams driven by its waters, with a pipe leading from each, one to the green-house and one to one of the barns. One dwelling and one barn and the green-house were on the part contracted to be conveyed; the other dwelling and barn, the spring and rams were on the lot of one acre reserved. Included in the sale were a lot of hot-house plants in the hot-house.

At and before the date of the contract the water was flowing continuously at both the barn and green-house, in the latter of which were the hot-house plants. The water was discharged at the barn into an open trough from which the cattle and horses drank, and at the green-house into a tank from which it was used in watering the plants. This flow was observed by the complainant, and he knew it was due to the action of a ram (he supposed there was but one) on the lot reserved, and such flow formed, in complainant's mind, a feature of value in the premises. The pipes and flow of water to the barn had existed for several years, but that to the green-house had been in use for less than two years. The ram which supplied it had been in place and use for many years, and carried the water in a pipe along the road in front of the premises in question to a property adjoining it on the other side, which property was sold by the defendant in 1890 to another party, and the flow of water to it was cut off and the pipe turned from the road up to this green-house, and was in use there from that time on.

The corporate authorities of Madison have recently erected water-works for the use of the town and its inhabitants, but no main has as yet been laid in the street in front of these premises.

Toothe v. Bryce.

The negotiations for the purchase and sale were carried on between the complainant in person and an agent of the defendant, and nothing was said by either in their course about the flow of water. Such flow continued up to the date of the delivery of the deed. Before ten o'clock on the morning of that day defendant directed his employe in charge of the premises to stop the operation of the rams, and then proceeded by train to New York to deliver the deed, which was done about eleven o'clock. The man in charge stopped the ram supplying the barn at once, but left the one supplying the green-house running until three o'clock in the afternoon. So that in point of fact the water was probably not running to the barn at the moment the deed was delivered, but was running to the green-house. No notice was given to the complainant at the delivery of the deed that the flow of the water had been stopped, nor was any mention made of it by either party. The deed contained the usual verbiage as to appurtenances, including "ways, waters, privileges" &c.

The springs driving the rams are about fifteen feet lower than the barn and green-house, so that the water would not run naturally to either. The difference in height between the spring and the rams does not appear.

The parties agreed that the court should act upon its personal knowledge of the peculiarities of hydraulic rams, which, so far as necessary for present purposes, are as follows: By the use of this machine the power due to the fall from a given height of a given quantity of water is utilized to lift a comparatively small fraction thereof to a height greater than the source or head. The effect of the machine is precisely the same as would be that of a water wheel driving an ordinary pump. The advantage of the use of the ram is its extreme simplicity and durability. It works automatically and in theory should run without stopping or touch by the hand of man until its parts were actually worn out. It is, however, liable to stop and requires the hand of man to start it again. This liability is due to several causes, none of which are of any importance, and all can be guarded against by proper care in setting it and in preventing substances other than water from passing through it, except one, viz., a necessary part of the

Toothe v. Bryce.

machine is a chamber of confined air which acts as a cushion. This air comes in contact with and is liable to be absorbed by the water and exhausted, and when the air-chamber becomes filled with water the ram works defectively and is liable to stop. The tendency of the air to be exhausted varies with the character of the water and the height or head to which it is lifted. If the water is lifted to a great height there is a corresponding pressure of the water upon the air and the absorption of the air by the water is increased thereby, but with a small height to lift against, like fifteen, twenty or thirty feet, rams may run for weeks and months without stopping. The process of recharging the air-chamber with air is very simple and may be done by any person in a few minutes. An hydraulic ram, properly set, may run for one or more years without any repair, and the operation of repair or renewal is very simple

*Mr. John C. Besson* and *Mr. Aub* (of New York), for the complainant.

*Mr. George G. Frelinghuysen*, for the defendant.

PITNEY, V. C.

The complainant rests his right to the continued flow of the water upon the fact that such flow was apparent and continuous at the time of the purchase, and constituted a valuable adjunct to the premises, rendering their use more beneficial and valuable.

Against the case thus made defendant makes three points—*first*, that the use of the water in the way described was not *necessary* to the enjoyment of the premises; *second*, that it was not in actual use at the moment when the title passed; *third*, that it was not in its nature continuous, since the water did not run by gravity, but by machinery, which required the intervention of the hand of man, upon the land of the grantor, the defendant.

I. As to the element of necessity. I think some inaccuracy of thought and expression has arisen in the discussion by bench and bar of this doctrine of the creation of an easement by im-

38

plication upon the severance of a tenement, as to the importance of the element of necessity, by failing to distinguish between that class of cases where it has been held or claimed that an easement is *reserved* by implication in favor of that portion of the tenement which is retained by the grantor in and upon that portion conveyed, and that other class of cases where it has been held that an easement was *granted* in favor of the part conveyed in and upon the part reserved. In the former class of cases the grantor is usually claiming an easement in direct derogation of his own grant, while in the latter it is well held to be in accordance with, and to flow naturally by implication from, his grant.

In fact it has been suggested that the grant in such cases is not by implication, but that the *quasi*-easement passes with the *quasi*-dominant tenement as, in substance, a part of the thing conveyed, and without any regard to the element of necessity. On the other hand, in the case of a reservation, it has been held that there can be no implied reservation of an easement in the land granted when the grantor has conveyed, as he generally does, all his right, title and interest therein, except such an easement as is absolutely necessary to any enjoyment of it whatever, as in the case of a way of necessity. *Gale & W. Easem. *72 ; Godd. Easem. (Am. ed.) 266, 267 ; Nicholas v. Luce, 24 Pick. 102 ; Oliver v. Pitman, 98 Mass. 46 ; Washb. Easem. *163, *164,* and cases.

To permit the grantor to claim such reservation is to permit him to derogate from his own grant. So rigid was this rule held that in the older cases the reservation of a right of way to and from the close retained by the grantor out of the conveyance of the land surrounding it was put on the ground of the interest that the public had that the close so surrounded should not be unused and unproductive. The conveyances in common use in this country contain an express conveyance of all the right, title and interest of the grantor in and to the premises conveyed, and it is difficult to perceive on what ground short of absolute necessity any easement could be reserved.

This distinction between a grant and a reservation by implication seems to be founded in logic and, as will appear further on,

Toothe *v.* Bryce.

is now thoroughly established in the English tribunals, and it seems to me to furnish the true test as to the value and importance of the element of necessity in the establishment of easements upon the division of tenements.

My examination of the authorities has led me to the conclusion that where the right to the easement is based upon the ground that it passes, as in substance, a valuable adjunct to the land conveyed, the element of necessity is not a requisite, and to use the word "necessary" in connection with it is to misuse it. In saying this, I may say that I am, in appearance at least, going contrary to what has been said and decided in many cases; but I think that an examination of them will show that in most, if not all, of those instances where the case was that of an implied grant of an easement in connection with the conveyance of a *quasi*-dominant tenement, the so-called "necessity" upon which the judges relied was, in fact, no necessity at all, but a mere beneficial and valuable convenience, and that this elevation of a mere convenience to the level of a necessity was the result of an attempt to obliterate the distinction between an implied grant and an implied reservation, before referred to, and to place implied reservations and implied grants upon the same footing, and to hold that upon the severance of a tenement one part of which had been subjected to a *quasi*-servitude, which was continuous and apparent, in favor of the other, the easement would be preserved, whether it be by grant, when the dominant tenement is conveyed, or by reservation, when the servient tenement is conveyed; and as the latter could only occur where the element of necessity was present, it was held that such element must also be present in the former case.

In the leading case of *Nicholas* v. *Chamberlain (1606)*, Cro. Jac. 121, the distinction would seem to have been entirely overlooked, for it was resolved, as reported, that "if one erects a house and builds a conduit thereto in another part of his land, and conveys water by pipes to the house, and afterwards sells the house with the appurtenances, excepting the land, *or sells the land to another, reserving to himself the house,* the conduit and

Toothe *v.* Bryce.

pipes *pass* with the house, because it is necessary and *quasi-*appendant thereto " &c.

I stop to say that I am unable to avoid a suspicion that the words " *or sells the land to another, reserving to himself the house,*" were not a part of the report when first prepared, but are an interpolation. The context indicates this. For how could the conduit and pipes be said to *pass with* the house if it was not *conveyed,* but *retained* by the grantor? What follows in the way of discussion by the judges upon suppositious cases indicates the same thing.

My interpretation of this report is that it holds that, if the house be conveyed, the pipes and conduit pass with it as *quasi-*appurtenant thereto. If the land be conveyed and the house retained, the pipes and conduit are reserved, if necessary to the use of the house. To reserve them on any other ground than necessity, would be to permit the grantor to derogate from his own grant.

The distinction between a grant and reservation was pointed out in *Palmer* v. *Fletcher (1663), 1 Lev. 122,* which was an action on the case for stopping lights. A man erected a house on his own land, and afterwards sold the house to one, and, still later, the land adjoining it to another, who obstructed the lights of the house, and it was resolved " that though it was a new messuage, yet no person who claimed the land by purchase from the builder of the house could obstruct the lights any more than the builder himself could, who could not derogate from his own grant, for the windows were a necessary and essential part of the house." And Mr. Justice Kelynge said : " Suppose the land had been sold first, and the house after, the vendee of the land might stop the lights."

Here it is manifest that there could have been no actual necessity for the use of the windows. The house could have been used without them, but their presence added to the value of such use. That and nothing more, for, if the lights were actually necessary, they would be reserved against the grant of the adjoining land precisely as would be a way of necessity.

In *Cox* v. *Matthews* (*1673*), *Vent. 239*, Sir Matthew Hale said: "If a man should build an house on his own ground, and then grant the house to A., and grant certain land adjoining it to B., B. could not build to the stopping of its lights in that case."

And Chief-Justice Holt, in *Rosewell* v. *Pryor* (*1701*), *6 Mod. 116*, held the same thing.

And again, in *Tenant* v. *Goldwin* (*1704*), *2 Ld. Raym. 1093*, Chief-Justice Holt is reported as saying: "If, indeed, the builder of the house sells the *house*, with the lights and appurtenances, he cannot build upon the remainder of the ground so near as to stop the lights of the house, and as *he* cannot do it, so neither can his vendee. *But if he had sold the vacant piece of ground and kept the house without reserving the benefit of the lights, the vendee might build against his house.* But in the other case, where he sells the house, the vacant piece of ground is by that grant charged with the lights."

Here, again, if the lights were necessary to the use of the house, they would be preserved either way.

These cases were approved and followed by Chief-Justice Tyndall in *Swansborough* v. *Coventry* (*1832*), *9 Bing. 305*, and again by the court of exchequer in *White* v. *Bass*, *7 Hurlst. & N. 722*.

*Canham* v. *Fisk* (*1831*), *2 Cromp. & J. 126*, was the case of a conveyance of a garden through which flowed an artificial water-course, carrying water from adjoining lands owned by the grantor. The plaintiff, the grantee, sued for diversion of the water of which he had had less than twenty years' use. At the trial he did not produce his deed. Lord Lyndhurst said: "The plaintiff has been in possession of this garden since 1811. That possession is evidence of a fee which can only pass by grant, and a grant of the land would carry the water. If the conveyance had been produced and had been silent as to the water, still the conveyance would have passed the water which flowed over the land." And Baron Bayley said: "If I build an house, and, having land surrounding it, sell the house, I cannot afterwards stop the lights of that house. By selling the house, I sell the easement also. This land is purchased with

the water running upon it, and the conveyance passes the land with the easements existing at the time."

It will be observed that the element of necessity was not considered, and it seems to me that the whole law as to implied grants is there clearly stated.

*Wardle* v. *Brocklehurst (1859), 1 El. & E. 1058,* was a case like the present, where the right to the use of water flowing through an artificial water-course was claimed under a grant which conveyed the premises in the usual terms, "together with water and water-courses, privileges" &c. Lord Campbell, in delivering judgment, used this language: "We think the effect of that deed of conveyance was to prevent the plaintiff from having a right to complain of the defendant continuing to use the water, as being a wrongful diversion of the stream. The owner of the plaintiff's land, and of the land where the diversion took place, grants the Red House Farm to the defendant. This, we think, *was a grant of the farm in the state in which it then was, with the water flowing through the culvert. The defendant had a right to have the farm continued in that state.* He had a right to the estate, with the culvert so running through it, as it did at the time when the conveyance was executed; and he was entitled to have the water flowing through that culvert, so that he might help himself, by means of the pipe, to the water from the culvert, for the supply of his Red House Farm premises. *The land must be taken to be conveyed in the state in which it then was;* that is, we must take it that the culvert so bringing down the water, and all the water-courses, &c., are granted, not only those which belong and appertain to the premises, *but also those which were used or enjoyed therewith.* After such a grant we think it impossible to say that the then owner of the plaintiff's land did not agree by deed that the water should continue to run down the stone culvert, and that he did not give up any right, which he might before have had, to insist on the water going down the Shores Clough Brook, toward the land which the plaintiff now enjoys. *Setting up such a right would be derogating from his own grant,* by preventing the water from flowing down the culvert in the course in which it had been accustomed

to flow and did flow at the time of the execution of the convey-
ance, and be hindering the defendant from the right of using it
for the purposes of the Red House Farm by means of pipes
running through the culvert."

It will be observed that no reliance is placed upon any notion
of any necessity.

This judgment was affirmed in the court of exchequer cham-
ber, where, as well, no mention is made of any element of
necessity.

Just before this case the famous case of *Pyer* v. *Carter (1857)*,
*1 Hurlst. & N. 916,* was decided, which was the case of a
drain, which carried water from the plaintiff's house under the
defendant's house to a public sewer. Plaintiff's grantor owned
both houses, and had constructed the drain, and had conveyed
one house to defendant before he conveyed the other to the
plaintiff; so that the case is, apparently, one of implied *reserva-
tion* of an easement by a grantor against grantee; and, in point
of fact, the first and only one in the English reports after *Nicho-
las* v. *Chamberlain;* and it was held that the easement was re-
served on the ground of *quasi*-necessity. But it was also held
that the question of necessity must be determined upon the con-
dition of affairs at the date of the conveyance to the defendant,
and the fact that the plaintiff could construct a drain to the sewer
at a trifling expense without crossing the defendant's land was
held immaterial. The court relied upon *Nicholas* v. *Chamber-
lain* and the text of *Gale on Easements* (second edition of *Gale &
Whatley*), and does not appear to have attended to the distinction
between a grant and a reservation.

This case has been severely criticised, and the principle upon
which it was put has been distinctly and finally overruled in
England, as will appear further on; but it has been held to have
been rightly decided upon a circumstance existing which was not
noticed or relied upon in the judgment of the court. That cir-
cumstance was this: At the severance of the title of the two
houses, the condition of things was that water from the eaves of
the defendant's house fell on to the plaintiff's house, and from
thence flowed down a spout into a drain on the plaintiff's prem-

Toothe *v.* Bryce.

ises, and from thence, through the drain in question, under the defendant's premises, into the common sewer; so that, in point of fact, the apparent and continuous easement was one by which water from the defendant's house was discharged on the plaintiff's house, and from thence escaped through the drain in question under the defendant's house, resulting in mutual easements; the defendant's house had an apparent easement upon the plaintiff's house, and the plaintiff's house had an apparent easement upon the defendant's land, and it would have been inequitable in the extreme to permit the defendant to say that the plaintiff did not have an easement over his land by which the very water that came on the plaintiff's land from the defendant's land was got rid of.

*Pyer* v. *Carter* was cited with approval in the Scotch appeal of *Ewart* v. *Cochrane (1861), 7 Jur. (N. S.) 925, 4 Macq. H. L. Cas. 117,* by Lord Campbell, as authority for the case of a drain from the land of the grantee to and upon that of the grantor, and, therefore, the case of an implied grant and not of an implied reservation; and Lord Campbell apparently fails to notice the distinction, and puts the case on the ground that the drain had been used, and was necessary for the comfortable enjoyment of that part of the property which was granted. He expresses himself thus: "When I said it was necessary, I do not mean that it was so essentially necessary that the property could have no value whatever without this easement, but I mean it was *necessary for the convenient and comfortable enjoyment of the property as it existed before the time of the grant.*"

Now it seems to me that this resort to a modification of the force of the word "necessary" shows that it is not appropriate to the occasion and ought not to be used in such connection.

*Polden* v. *Bastard (1863), 4 Best & S. 257, L. R. (1 Q. B.) 156,* on appeal, was the case of a right of way to and from a well and to take water therefrom. The right failed on the distinction between a continuous and non-continuous easement, the present being held nothing more than a right of way and so non-continuous.

Chief-Justice Erle, in his judgment on appeal (*L. R.* (*1 Q. B.*) *161*), says: "There is a distinction between easements, such as a right of way or easements used from time to time, and ·easements of necessity *or* continuous easements; and it is clear law that upon the severance of tenements, easements used as of necessity, *or* in their nature continuous, will pass by implication ·of law, without any words of grant."

This language shows, as I think, that the learned chief-justice ·did not consider that *necessity* was a requisite if the easement be ·apparent and continuous. The word "or" is used to. distin- ·guish between easements of necessity and continuous easements.

Lord Westbury in *Suffield* v. *Brown* (*1864*), *4 DeG., J. & S. 185*, attacked and repudiated the doctrine of implied reservation ·asserted in *Pyer* v. *Carter*, and declared, though not necessary to the decision of the cause, that a grantor cannot derogate from his ·own absolute grant so as to claim rights over the thing granted, ·even if they were at the time continuous and apparent easements. He also refuses assent to the doctrine on this subject found in *Gale on Easements* *\*49*, which he declares a novelty in English ·jurisprudence, points out its origin in the French civil code and ·declares that it is contrary to English law. He disapproves of *Pyer* v. *Carter*, and attempts to distinguish it from *Nicholas* v. *Chamberlain*.

This doctrine of Lord Westbury was expressly approved and ·applied by Lord Chelmsford (who sat with Lord Campbell in *Ewart* v. *Cochrane*), in *Crossley* v. *Lightowler* (*1867*), *L. R.* (*2 Ch. App.*) *485*, and he declares that no reservation of an ease- ·ment could be implied except in case of absolute necessity.

In other words, these learned judges thought that there could ·not be an implied reservation of an easement except by reason ·of absolute necessity, as in the case of a way of necessity. And Lord Westbury held that a grant of an apparent·and continuous ·easement will be implied upon ordinary principles of construc- ·tion.

This distinction between an implied grant and an implied ·reservation was taken in the later case of *Watts* v. *Kelson* (*1870*), *L. R.* (*6 Ch. App.*) *166*, decided by Lord-Justices Mellish and

James, both eminent judges.    That was a case of a water-course, and the *quasi*-dominant tenement was (as here) first conveyed by a deed containing the same verbiage as is found in the one in this case, and Lord-Justice Mellish, after referring to Lord West-bury's criticisms of *Pyer* v. *Carter*, and showing that they did not apply to the case in hand, held that the easement passed by the grant, and continued : " It was objected before us, on the part of the defendant, that on the severance of two tenements no ease-ment will pass by an implied grant, except one which is necessary for the use of the · tenement conveyed, and that the easement in question was not necessary.    We think that the water-course was necessary for the use of the tenement conveyed.    *It was, at the time of the conveyance, the existing mode by which the premises· conveyed were supplied with water, and we think it is no answer that, if this supply was cut off, possibly some other supply might have been obtained.*    We think it is proved on the evidence that no other supply of water equally convenient or equally pure· could have been ˙ obtained.    *We are also of opinion that the· language of the conveyance was sufficient to pass the right to the water-course, even if it was not necessary, but only convenient, for the use of the premises."*

It seems to me that the true rule is stated in this last sentence.

In the still more recent case of *Wheeldon* v. *Burrows (1879), L. R. (12 Ch. Div.) 31,* the whole question was gone over; the distinction between an easement arising by reservation and one arising by grant was thoroughly considered and discussed both by the vice-chancellor and the lord-justices on appeal, and the distinction in question pointed out and sustained; the case of *Nicholas* v. *Chamberlain* was explained, and the principle upon which *Pyer* v. *Carter* was decided was distinctly overruled, and it was held that there could be no reservation of a right of this kind except on the ground of absolute necessity.

The result of these English cases is thus stated by Mr. God-dard, in his treatise, writing before *Wheeldon* v. *Burrows* was decided (*Godd. Easem. (Am. ed.) 119 bottom, 120 top*):

"If the owner of an estate has been in the habit of using *quasi*-easements of an apparent and continuous character over one part for the benefit of the

Toothe v. Bryce.

other part of his property, if he sells the *quasi*-dominant part, the purchaser will, in the absence of express stipulations, and independently of the general words in the deed of conveyance, become entitled to the easements by implied grant, but if sells the *quasi*-servient part, these easements will not be reserved by implied grant."

He thus eliminates the element of necessity from the subject.

Mr. Bennett, in his *addenda* to the American edition of this treatise, (at *pp. 122, 124,*) states the result of the later American decisions to be the same, stating the doctrine substantially thus : If the *quasi*-dominant tenement be conveyed, a *quasi*-easement will pass, if it be continuous and apparent, and also convenient and beneficial. If, however, the *quasi*-servient tenement be conveyed, the *quasi*-easement will not be reserved by implication, unless it be absolutely necessary.

In the original text of *Gale & Whatley on Easements* *49 ch. 4 (1839)*, the learned authors say :

"The implication of the grant of an easement may arise in two ways: First. Upon the severance of an heritage by its owner into two or more parts; and, secondly, by prescription. Upon the severance of an heritage a grant will be implied, first, of all those *continuous and apparent easements which have in fact been used by the owner* during the unity, though they have had no legal existence as easements; and, secondly, of all those easements without which the enjoyment of the severed portions *could not be fully had.*"

It will here be observed that in asserting that continuous and apparent easements will pass by grant he makes no mention of any necessity as a requisite therefor.

In the later editions of this work, prepared by Mr. Gale himself, and cited as *Gale on Easements,* this language is changed thus :

"Upon the severance of an heritage a grant will be implied, first, of all those continuous and apparent easements which have in fact been used by the owner during the unity *and which are necessary for the use of the tenement conveyed,* though they have no legal existence as easements; and, secondly, of all those easements without which the enjoyment of the severed portions could not *be had at all.*"

The author gives no reason for this change and cites no authority for it.

Now, in my opinion, the first part of the proposition was correctly stated in the first edition, and the second part of it was correctly stated in the later editions and not in the first. And a careful examination of the authorities leads me to the conclusion that this introduction into the second edition of this useful and much relied upon treatise of the quality of necessity as requisite in an apparent and continuous easement, in order that it should pass with a grant, was its first introduction into our system of jurisprudence. For while it was mentioned in *Nicholas* v. *Chamberlain (1606)*, and *Palmer* v. *Fletcher (1663)*, the cases which intervene between those cases and the publication of Mr. Gale's second edition do not show that it was considered a requisite.

This author stoutly maintains that the *quasi*-easement, when continuous and apparent, is preserved on a severance of the tenement, as well by way of *reservation* as by way of *grant*, and he relied not so much on the resolution in *Nicholas* v. *Chamberlain* as upon the principle found in the French civil code called "the disposition of the owner of two tenements"—"*destination du père de famille*"—and in his first edition, as already shown, he makes no mention of any element of necessity, nor is any found in the French code. His reasoning is quite independent of any aid from such element. It is, however, inconsistent with the settled construction put upon the conveyances in use in England, and was thoroughly exploded, first by Lord Westbury in *Suffield* v. *Brown,* and later in the other cases above cited.

Turning now to the authorities in this country, we have the leading case of *Lampman* v. *Milks (1860), 21 N. Y. 505,* in which Mr. Justice Selden makes an elaborate examination of the authorities, including *Nicholas* v. *Chamberlain* and the first edition of *Gale & Whatley on Easements,* but not noticing *Pyer* v. *Carter.* The case before him did not call for any expression of opinion upon the question of implied reservation, it being one of implied grant and not of implied reservation. He, however, declares that, upon a severance of an estate, an implied reservation of an apparent and continuous easement would obtain where the servient tenement was conveyed and the dominant reserved.

Toothe *v.* Bryce.

The learned judge placed no reliance upon, and made no mention of, any element of necessity. He cited and followed in this respect the text of the original edition of *Gale & Whately on Easements*, which, as we have seen, omits mention of that element in these cases.

*Curtiss* v. *Ayrault* *(1871)*, *47 N. Y. 73*, was the case of a water-course, and, in substance, the same as *Canham* v. *Fiske*, *Wardle* v. *Brocklehurst* and *Watts* v. *Kelson*, *supra*. The owner of a large tract of land, upon which was a marsh, dug an artificial water-course, by which the marshy part was drained and another part supplied with water for cattle, and then severed it by conveyances made at one time. It was held that the grantee of the part supplied with water was entitled to have the flow continued from the marshy part, and the grantee of the marshy part had no right to stop it. The ground of the decision is thus stated : "Where the owner of a tract of land, upon which was a marsh, has dug a ditch therefrom through other portions of the tract, making a permanent channel, in which the water gathered in the marsh flows in a continuous stream, mutually benefiting the land drained, and the lands to which is conveyed a supply of good water, and subsequently, and while these reciprocal benefits and burdens were existing and apparent, has divided the tract into parcels, and conveyed the parcels to different grantees, who contracted with reference to such a condition of the lands, the respective grantees have no right to change the relative condition of one parcel to the injury of another. *It is the open and visible effect which the change has wrought which is presumed to influence the mind of the purchaser. The question is, did the purchaser, in arriving at the price he would pay, consider, and have a right to consider, as an element of the value of the land he was bidding for, the benefits it derived from the artificial channel?*" This seems to me to be the true ground of judgment in these cases.

Turning now to the cases in this state, we find that the distinction between a *reservation* and a *grant* was taken and upheld by Chancellor Williamson in *Brakely* v. *Sharp, 1 Stock. 9*, and, again, in the same case, *2 Stock. 207;* and, again, noticed

by Chancellor Green in *Seymour* v. *Lewis (1861), 2 Beas. 439* (at *p. 444*). This last was a case of *reservation*, and it was held that, under the circumstances of the case, the easement was reserved. The chancellor relies upon *Gale & Whatley on Easements* and the resolution in *Nicholas* v. *Chamberlain*, and upon the circumstance that the tenements severed were (as in *Pyer* v. *Carter*) both dominant and servient with mutual easements, and that the one conveyed had an easement to have the water discharged over the land reserved, as well as the latter to have it flow from the former (*see 2 Beas. 448, 449*), and, as I interpret the case, he makes no use of the element of necessity. He refers to the original text of *Gale & Whatley*, and also to the then recent case of *Lampman* v. *Milks, 21 N. Y. 507*, in which, as we have seen, the element of necessity is not mentioned.

The same learned judge asserted the same doctrine—that *reservation* and *grant* stand on the same footing—in the *Central R. R. Co.* v. *Valentine, 5 Dutcher 561*, in the court of errors and appeals. There Valentine claimed under an express reservation in his lessor's deed to the railroad company. But the chancellor declared (at *p. 564*) that the right would have been reserved by implication without any express reservation; and he cites *Lampman* v. *Milks, Nicholas* v. *Chamberlain, Pyer* v. *Carter* and *Gale & W. Easem., supra*, and makes no reference to any element of necessity.

The case shows that this *dictum* was wholly *obiter*, and not necessary to the decision of the cause.

Chancellor Zabriskie in *Fetters* v. *Humphreys (1867), 3 C. E. Gr. 260* (at *pp. 262, 263*), notices the distinction, but declares that the right is mutual and that the easement is reserved where the *quasi*-servient tenement is conveyed and the dominant tenement reserved, relying, as did Chancellor Green in *Central R. R. Co.* v. *Valentine*, upon *Nicholas* v. *Chamberlain, Pyer* v. *Carter* and *Lampman* v. *Milks*.

He asserted the same doctrine in *Denton* v. *Liddell, 8 C. E. Gr. 64*, and in both cases the assertion was *obiter dictum*, and not necessary to the decision of the cause.

*De Luze* v. *Bradbury, 10 C. E. Gr. 70*, was the case, like the present, of a conveyance of the *quasi*-dominant tenement by the owner of the *quasi*-servient tenement, and, as here, involved the right to the flow of water from a spring on the servient tenement for the use of the dwelling on the dominant tenement. The right was established without resort to the element of necessity.

The latest case in this state is *Kelly* v. *Dunning, 16 Stew. Eq. 62*, decided by Vice-Chancellor Van Fleet in 1887. That, like this, as I infer from the report, was the case of a conveyance of a *quasi*-dominant tenement, and the retention of the *quasi*-servient tenement, and, therefore, a case of *grant* and not of *reservation*. The right was one of drainage. The complainant purchased his tenement of one Trippe, the owner of both tenements, in 1867. At that time the drain was in existence, carrying the water from complainant's lot across the remainder of Trippe's land, a part of which was conveyed to the defendant in 1884. In discussing the doctrine applicable to the case the learned vice-chancellor treats it as settled in this state that there is no difference between the case of a reservation of an easement where the conveyance is of the servient tenement, and the case of a grant where the conveyance is of the dominant tenement, following in this respect the decision of Chancellor Green in *Seymour* v. *Lewis*, and the *dicta* of the same judge in *Central R. R. Co.* v. *Valentine*, and of Chancellor Zabriskie in *Fetters* v. *Humphreys* and *Denton* v. *Liddell*, and he holds that, under those authorities, a certain measure of necessity for the use of the easements is a requisite in each case. And, following the definitions of the late English cases, he holds that, if the easement be *necessary for the convenient and comfortable enjoyment* of the property as it existed at the time of the conveyance, it will pass. In this he is supported by the latest English case—*Wheeldon* v. *Burrows*—and by the late New York cases.

These cases in our own state have probably established the doctrine here—certainly in this court—that in these cases of apparent and continuous easements, upon the severance of the tenement, a *reservation* of a *quasi*-easement will take place on the

conveyance of the servient part, wherever it would pass by way of *grant* on the conveyance of the dominant part, and that in each case the element of necessity is a requisite. But for myself, I desire to repeat, by way of protest, that my examination of the authorities has led me to the conclusion that this doctrine of mutuality is not founded on solid ground and is mischievous in its tendencies, and also that it is a misapplication of the word "necessary" or "necessity" to apply it to such a case, and leads to uncertainty and confusion in attempting to define different degrees of the element, when, in fact, strictly speaking, it is not capable of being graded.

It seems to me that the proper inquiry in such cases is whether the apparent and continuous easement in question forms a part of the tenement, and is beneficial to and adds to its value for use, and will continue to do so in the future. If it is, then the grantee is, upon plain principles, entitled to have it continued. He is entitled to enjoy the thing as it was when he bought it, with all its apparent appurtenances, if those apparent appurtenances are apparently permanent, and are useful and add to its value.

In the case in hand, I think there can be no doubt that the flow of the water at the barn or stable and at the green-house are valuable additions to the property, increase its beneficial use, and also that it is necessary in the sense in which that word has been used in that connection, and is defined by Vice-Chancellor Van Fleet in *Kelly* v. *Dunning;* and I adopt the language of Lord-Justice Mellish in *Watts* v. *Kelson,* above quoted, as applicable to this case.

It would be no answer to say, if it were true, that the complainant may procure water to supply these places from the public water-works at a comparatively trifling expense. That expense, though trifling, is continuous, and it was the relief from its burden which formed the element of value in the water which was actually flowing.

II. The second objection made presents little difficulty. Complainant is clearly entitled to have the premises in the condition which they were at the time he made the contract—April 13th,

Toothe *v.* Bryce.

1892. His right to them vested at that date. As the contract was positive and binding on both parties—defendant being bound to convey and the complainant to purchase and pay the price—the familiar rule in equity is that from that time on, the premises in question belonged to the complainant, subject to the lien of the purchase price, and that the purchase price belonged to the defendant. It would be monstrous, indeed, to hold that the defendant might, at the very moment that the deed was being delivered in New York, by his agent in Madison destroy an apparent and continuous easement and deprive the complainant of the benefit of it.

Nor can the defendant, as the case now stands, deny the right of his agent to sign the contract for him as his agent. The execution of the deed in pursuance of it was a ratification and adoption of the previous contract, with all its burdens as well as its benefits.

III. The third question presents more difficulty. Was the easement in its nature continuous, considering the fact that the water did not run by gravity, in the ordinary sense of the term, but was forced up by a machine driven by the power of the fall of a greater quantity, and that it would be necessary for the complainant to enter on the servient tenement from time to time to readjust, repair, and renew this machine?

All cases of this character deal with artificial structures, situate in whole or in part on the servient tenement, which are liable to fall into disorder and decay, and all the adjudged cases hold that the owner of the dominant tenement may enter upon the servient tenement for the purpose of repairing and renewing those artificial structures. It was so declared in *Nicholas* v. *Chamberlain*, and Mr. Gale quite properly calls this right of reparation and maintenance a "secondary easement" (*Gale & W. Easem. *323;* Washb. Easem. *24, *25*), which is appurtenant to the primary or actual easement.

If, in the case in hand, the water ran by gravity in an artificial channel, complainant would have the right to enter from time to time upon defendant's land, and repair and renew such part of it as was there situate. So if the water—supposing it to be practi-

39

Toothe *v.* Bryce.

cable—were raised by a dam instead of a ram to the height necessary to make it flow to the barn and green-house, the right of reparation and renewal of this dam would be included, and, in such a case as this, the head or power would be employed to carry it.

These secondary easements, however, are not the easement which passes with the conveyance by implied grant because apparent and continuous. They are, as before remarked, merely incidents thereto, and, because of their non-continuous and desultory character, the principal easement is none the less continuous.

In this connection, what is said by Mr. Gale in his treatise is not without import (*50):

"An easement is a quality superadded to the usual rights, and, as it were, passing the ordinary bounds of property; and, with the exception of those easements the enjoyment of which depends upon *an actual interference of man at each time of enjoyment, as of a right of way,* it is attended with a permanent alteration of the two heritages affected by it, showing that one is benefited and the other burdened by the easement in question."

His idea of a non-continuous easement is one whose enjoyment depends upon an actual interference of man at each time of enjoyment—as in *Polden* v. *Bastard, supra.* And it seems to me that that is the correct test, and that the mere fact that a machine is used which is substantially self-acting, and does not require the constant attention of man, does not make it non-continuous, any more than the propulsion of the water by a dam through an artificial channel would have that effect. It is said that the owner of the servient tenement will be subjected to the servitude of a more frequent entrance upon his land for the purpose of adjusting and repairing the ram than he would in case of an artificial ditch or pipe or dam. But I think the difference is one of degree and not of character, and it is hardly necessary to say that a mere difference of degree will not alter the case.

I will advise that an injunction issue.