Curran, Dennis J., J.
This action for declaratory judgment arises from a dispute between the plaintiff Blackstone Smithfield Corporation, and defendantTown of Blackstone, Massachusetts, as to whether the Town is obligated to supply water to Blackstone Smithfield’s property in North Smithfield, Rhode Island, pursuant to a 1934 agreement between the parties’ respective predecessors-in-interest. On May 30, 2008, Black-, stone Smithfield filed a complaint for declaratory relief seeking a declaration that the Town is enjoined from interrupting the Property’s water supply. The complaint also alleges a count for intentional interference with advantageous and contractual relations, which appears to be directed at defendant Constance Perreault, Chairwoman of the Town’s Board of Selectmen. Blackstone Smithfield now moves for partial summary judgment on Count I of its complaint, seeking a declaration of the parties’ rights and obligations under the 1934 Agreement. The Town crossmoves for summary judgment on both counts, to the extent that the intentional tort claim in Count II is also directed at the Town.[2] For the reasons below, Blackstone Smithfield’s motion is ALLOWED, and the Town’s crossmotion is DENIED as to Count I. As to Count II, the Town’s motion is ALLOWED insofar as Blackstone Smithfield seeks to hold the Town liable for the intentional tort of an employee.[3]
BACKGROUND
Blackstone Smithfield is the owner and developer of real estate (“the Property”) located in North Smithfield, Rhode Island, near the Massachusetts border and the Town of Blackstone. During the past three years, Blackstone Smithfield has developed the Property into residential condominiums and a light manufacturing facility.
Until 1934, Lonsdale Company owned both the Property and a private water system that provided water to the Property and surrounding areas. In 1934, Lonsdale sold its private water system to the Blackstone Water Company (“the Water Company”). Pursuant to an agreement executed at the time of the conveyance (“the 1934 Agreement”), Lonsdale reserved for itself and its successors the right to buy water from the Water Company for its property in Blackstone and North Smithfield.[4] The deed from Lonsdale to the Water Company was recorded in the Worcester Registry of Deeds on November 30, 1934. The 1934 Agreement was not recorded at that time.
In 1954, the Water Company conveyed to Textron Incorporated a portion of the property interest it had acquired in the water pipes and mains. The deed from the Water Company to Textron (“the Textron Deed”) explicitly referenced the 1934 deed from Lonsdale to the Water Company, as well as the 1934 Agreement. The Textron Deed was recorded, along with the 1934 Agreement, in the Worcester Registry of Deeds on Februaiy 26, 1954.
By a deed dated Februaiy 23, 1954, the Water Company conveyed its remaining interest in the water pipes and mains to the Town. The deed between the Water Company and the Town explicitly referenced the 1934 deed from Lonsdale to the Water Company, but did not reference the 1934 Agreement. After taking title to a portion of the water-supply system, the Town supplied water to the Property for more than five decades. In *660 March 2008, the Town declared that it would stop supplying water to the Property as of July 1, 2008.[5]
It is not disputed that Blackstone Smithfield is a successor-in-interest to Lonsdale and that the Town is a successor-in-interest to a portion of the Blackstone Water Company’s original estate, which was subject to the 1934 Agreement. It is also not disputed that the Property falls entirely within the bounds of the original Lonsdale estate. Blackstone Smithfield has introduced evidence, by affidavit, that the Property currently has no independent source of potable water other than the water supplied by the Town. The Town has not refuted this claim, but instead argues that the availability of other water sources is a matter for discovery.
DISCUSSION
Both parties agree that the 1934 Agreement created some manner of servitude that required the Water Company to provide water to the Properly. At the center of the parties’ dispute is whether that servitude took the form of an easement or a covenant and whether it is capable of binding the Town as the Water Company’s successor.
An easement is “an interest in land which grants to one person the right to use or enjoy land owned by another.” Commercial Wharf East Condominium Assoc. v. Waterfront Parking Corp., 407 Mass. 123, 133 (1990). Specifically, it is “a right, which one proprietor has to some profit, benefit, or beneficial use, out of, in, or over the estate of another proprietor.” Id., quoting Ritger v. Parker, 8 Cush. 145, 147 (1851). By contrast, a covenant, as it relates to real property, is a promise or contractual obligation to do or to refrain from doing something related to land. See, e.g., Whitins ville Plaza, Inc. v. Kotseas, 385 Mass. 85, 90 (1979) (outlining requirements for a covenant to run with land).
The Town argues that the 1934 Agreement merely created a covenant obliging the Water Company to “sell and deliver” water, not an easement that reserved for Lonsdale and its successors the right to “use or enjoy” the land, water pipes and water mains owned by the Water Company and its successors. The Town suggests that the legal distinction between easements and covenants is critical to the Court’s determination of the rights and responsibilities of the parties in this case. Recently, however, common law has trended toward minimizing the significance of the formalistic distinctions between easements and covenants, instead evaluating them under the broader category of “servitudes.” Restatement (Third) of Property (Servitudes) §1.1, Reporter’s Note (noting that “servitude” has evolved into a “generic, umbrella term for easements, licenses, and running covenants”). According to the Restatement, servitudes are broadly defined as “land-use arrangements that remain intact despite changes in ownership of the land.” Id. at §1.1, Comment a.
In determining the effect of the 1934 Agreement, the Court is more concerned with Lonsdale’s clear intent to create a servitude that ran with the Property and ensured access to useable water than it is with the precise form that the intended servitude took. See Well-Built Homes, Inc. v. Shuster, 64 Mass.App.Ct. 619, 629 (2005) (“[W]here the parties’ intent is readily ascertained, the general policy in favor of free alienation does not require us to elevate form over substance”). The 1934 Agreement specifically provides that “[u]pon the request of LONSDALE COMPANY the WATER COMPANY will sell and deliver water from said system to LONSDALE COMPANY, for use in its severed properties, whether located in Blackstone or North Smithfield, which are located within the area served by said system . . .” It further provides that “. . . each of the parties hereto agree that the foregoing contract shall be binding upon and shall insure to the benefit of their respective successors and assigns.”[6]
In effect, Lonsdale reserved for itself the right to have water supplied to it from the water-supply system that it conveyed to the Water Company. Although the manner of achieving that benefit took the form of an affirmative covenant to “sell and deliver water” upon request, Lonsdale’s reservation of the right to enjoy the benefits of the water-supply system had the essential characteristics of an easement appurtenant to land. See Schwartzman v. Schoening, 41 Mass.App.Ct. 220, 223 (1996) (“An easement is appurtenant to land when the easement is created to benefit and does benefit the possessor of the land in his use of the land”). What distinguishes the 1934Agreement’s reservation of water rights from the traditional easement is that it required the Water Company and its successors not merely to submit passively to the taking of water, but rather to actively supply it. Cf. Mt. Holyoke Realty Corp. v. Holyoke Realty Corp., 292 Mass. 332, 335 (1935) (“[A)s a general rule, easements impose no obligation upon those, whose lands are thus placed in servitude, to do anything”). In this case, however, practical considerations dictated the form by which Lonsdale reserved the right to a continued supply of water for its successors, as it was far more reasonable to charge the Water Company with the task of delivering water through the pipes and mains for a fee than it would have been for Lonsdale to find a means of extracting it. In light of the attendant circumstances, the Court finds that Lonsdale’s intent was not merely to impose on the Water Company an obligation to sell and deliver water; rather, its intentwas to create an easement that would run with the land and bind both parties’ successors. It is clear that Lonsdale would not have surrendered rights to its private water supply system without ensuring that the parcels that had previously been serviced by the system were left with a means of acquiring water.[7]
Even if Lonsdale had failed to properly reserve an express easement for the benefit of the Property, the existence of an easement was implied by the circumstances. “Such interests have been recognized when land was formerly in common ownership, when use of one part of the land was made for the benefit of another part up until the time of the severance of ownership, and *661 when the use of one part is both reasonably ascertainable and reasonably necessary for the enjoyment of the other part.” Flax v. Smith, 120 Mass.App.Ct. 149, 152 (1985). Here, Lonsdale previously owned both the Property and the water-supply system now owned by the Town. Lonsdale used the water-supply system for the benefit of the Property before ownership was severed, and such use was both reasonably necessary for enjoyment of the Property and reasonably ascertainable by virtue of the fact that the Town acquired a functioning water-supply system whose pipes and mains were connected to the Property. See id. at 152-54 (defendant’s property was burdened by easement for water and sewer lines in favor of plaintiff where the property had been held in common ownership, use of the plaintiffs property required that water and sewer services be supplied through lines on defendant’s property, and the lines had served the plaintiffs property continuously since 1950).
Whether by express grant or by implication, the circumstances of the severance of Lonsdale’ original estate clearly created an appurtenant servitude. The benefit of the servitude passed automatically to Blackstone Smithfield by the deeds of its predecessors. G.L.c. 183, §15; Labounty v. Vickers, 352 Mass. 337, 346 (1967). Ordinarily, the burden of the appurtenant servitude also passes automatically upon transfer of the servient parcel. Restatement (Third) of Property (Servitudes) §5.1, Comment b. However, under the recording statute in Massachusetts, the burden of an appurtenant servitude does not transfer to the subsequent purchaser of a servient parcel unless he has notice of the obligation. See G.L.c. 183, §4; Lamson & Co. v. Abrams, 305 Mass. 238, 244 (1940) (defining term “conveyance” within meaning of G.L.c. 183, §4, to include “encumbrances”).
The record shows that the 1934 Agreement, which expressly reserved the water rights at issue, was not recorded until three days after the Town purchased the water-supply system from the Water Company. Moreover, Blackstone Smithfield has not introduced any evidence that would tend to show that the Town had actual notice of the 1934 Agreement at the time of purchase, though it has not conceded the point. See Hanson v. Lindsay, 444 Mass. 502, 509-10 (2005). While it is not clear whether the Town had actual notice of the 1934 Agreement, this fact question does not preclude the Court from declaring the rights and obligations of the parties on summary judgment. Even if the servitude expressly reserved in the 1934 Agreement were extinguished by lack of notice under the recording statute, the Town is still chargeable with knowledge of the circumstances giving rise to an implied easement over the property it acquired from the Water Company.
Indeed, notwithstanding the Town’s argument that the notice requirements of the recording statutes are to be strictly construed in favor of bona fide purchasers, the Court notes that, under similar circumstances where the existence of underground utilities gave rise to an implied easement, the Supreme Judicial Court has held that the purchaser took title subject to the implied easement where the existence of the utilities was obvious or could reasonably have been ascertained. See Cummings v. Franco, 335 Mass. 639, 643-44 (1957) (implied easement existed over water pipes and electrical wires, without consideration of whether the subsequent purchaser had actual or constructive knowledge, where the maintenance of the pipes and wires was of such a character that their use was obvious when the purchaser took title); Jasper v. Worcester Spinning & Fishing Co., 318 Mass. 752 (1945) (implied easement gave owner of dominant parcel right to draw water from canal, even where deeds made no mention, of water rights, where obvious physical situation of canal and dominant parcel warranted finding that the grantees knew what they were buying, and that it was the intention of the parties that water rights reserved for benefit of dominant parcel); Flax, 120 Mass.App.Ct. at 152 (implied easement existed over water and sewer lines, even if their exis-' tence was not actually known to the grantor, where he could reasonably have ascertained the true facts). Even where easements are implied by the circumstances of a conveyance, the law requires that subsequent purchasers have notice of the pertinent facts relative to the existence of the easement. Jasper, 318 Mass. at 759. When evaluating whether subsequent purchasers have sufficient notice of implied obligations affecting their title to land, “the fact that such knowledge was given is the thing that is important rather than the means by which it is imparted.” Id.
That the 1934 Agreement was not recorded prior to the Town’s purchase of the water-supply system and that Blackstone Smithfield has not presented evidence that the Town had actual notice of the 1934 Agreement does not extinguish the implied easement. The Court finds that, as a matter of law, the Town was charged with notice of the Property’s prior use of the water-supply system when it acquired the system. The Town’s deed specifically referenced the 1934 deed from Lonsdale to the Water Company, which was recorded on November 30, 1934. The plan recorded with that deed, titled “Plan of Water Supply System,” displayed both the Property and the portions of the water-supply system to which the Town subsequently took title on February 23, 1954. Together, the deed and accompanying plan revealed both the nature of the system that the Town acquired and the relationship of the “pipes, mains, connections and appurtenances” to the Property. The Town cannot seriously maintain that it acquired the rights to a water-supply system that serviced the Property but had no knowledge that the original parties intended that water service continue beyond severance of the parcels. The prior use was even more obvious here than in traditional cases because the Town specifically acquired the water mains and pipes in question, and did not merely purchase land under which they were hidden but discoverable. Cf. Flax, 120 Mass.App.Ct. at 152. The fact that the Town continued supplying water to the Property where the Water *662 Company left off further undercuts any plea of ignorance as to the relationship between the parcels. Thus, even if the Town did not have specific notice of the 1934 Agreement expressly reserving for Lonsdale and its successors the right to purchase water from the system adjoining the Property, it could certainly be charged with notice of an implied easement for the same purpose.
In further support of this ruling, the Court notes that the Restatement has identified servitudes implied by prior use of underground utilities as one of the categories that is exempt from extinguishment under recording statutes. Restatement (Third) of Property (Servitudes) §7.14, Comment a. The Restatement explains that “(t)he rationale for protecting those servitudes from extinction under the recording act is the same as the rationale for permitting them to be created despite the fact that they are not visible: the economic burden of continuing the servitude will normally be relatively slight while the cost of relocating the utility lines will often be relatively high, and the duplication of facilities may entail wasteful expenditures.” Restatement (Third) of Property (Servitudes) §7.14, Comment d. Although Massachusetts has not officially adopted this principle, it is implicit in the approach that the appellate courts have taken when subj ecting land carrying pre-existing utility lines to implied easements even in the absence of constructive or actual notice. See e.g., Flax, 20 Mass.App.Ct. at 152 (implied easement existed over water and sewer lines, whether or not actually known to the grantor, where he could reasonably have ascertained their existence); Restatement (Third) of Property (Servitudes) §2.12, Comment g (“Although traditional doctrine required that the prior use be apparent or visible as a prerequisite to establishing a servitude by implication, courts often reached the result called for by the rule stated in this section, even though the utility lines were buried and their location was not known to the parties. To do so, they labeled these uses ‘apparent’ on the ground that a reasonable inspection would have disclosed the location of the underground lines, or that then-existence could have been inferred from the visibility of surface appliances connected to the lines”).
Finally, with respect to the Town’s argument that it is precluded from providing water to the Properly pursuant to Town of Blackstone Code §189-11, which prohibits the delivery of water to properties outside the Town without approval by a two-thirds vote at a Town meeting, the Court holds that the Town may not use the bylaw, which was adopted on April 25, 1994, to abrogate the obligation that it assumed when they acquired the water-supply system in 1954.
For the foregoing reasons, the Court declares that: (1) the water-supply system now owned by the Town is subject to an appurtenant servitude that exists for the benefit of the Property and allows continued access to water from the system; and (2) the Town must continue supplying the necessary water to the Property. To the extent that the express terms of the 1934 Agreement do not govern the scope of the servitude because it was not timely recorded, equity demands that the water be supplied at a reasonable rate.
ORDER
It is hereby ORDERED that the plaintiffs motion for partial summary judgment is ALLOWED. The defendant’s crossmotion for summary judgment is DENIED as to so much of the complaint that seeks a declaration that it has no obligation to continue providing potable water to the plaintiff, and it is ALLOWED as to so much of the complaint as alleges that the Town is liable for the intentional torts of its employee.
It is further ORDERED that judgment shall enter for the plaintiff declaring that: (1) the benefit and burden of continued access to water from the water-supply system runs with the parties’ respective parcels; and (2) the Town is obligated to continue supplying the necessary water at a reasonable rate.

 The Town has also filed a counterclaim for declaratory relief in its answer. The Court’s consideration of the cross motions for summary judgment disposes of the counterclaim.

 Blackstone Smithfield cannot maintain its claims under Count II against the Town because, under the Massachusetts Tort Claims Act, municipalities are not liable for “any claim arising out of an intentional tort, including . . . interference with advantageous relations or interference with contractual relations." G.L.c. 258, § 10(c); see also Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 397 (1996).

 The 1934 Agreement provides in relevant part, “Upon the request of LONSDALE COMPANY the WATER COMPANY will sell and deliver water from said system to LONSDALE COMPANY, for use in its several properties, whether located in Blackstone or North Smithfield, which are located within the area served by said system, at the same rates and upon the same conditions as those established for all its customers . . .” The 1934 Agreement also provides that the “contract shall be binding upon and shall inure to the benefit of their respective successors and assigns.”

 By stipulation of the parties, the Court (Roach, J.) preliminarily enjoined the Town’s decision to stop supplying water to the Property.

 According to the Restatement, “[c]ommonly used formulas for stating intent to create servitudes include statements that the interests . . . ‘bind’ or ‘inure’ to the benefit of ‘heirs and assigns’ or ‘successors’ of the parties.” Restatement (Third) of Property (Servitudes) §2.2, Comment d.

 Lonsdale’s concern for the fate of its remaining properties is evidenced by a portion of the 1934Agreement which provides that “. . . the promises of the WATER COMPANY hereinbefore contained . . . constitutes a vital and valuable portion of the consideration to be received by the LONSDALE COMPANY for giving such conveyance, rights and obligations, and that it is in reliance upon, and solely because of, the WATER COMPANY’S said promises that LONSDALE COMPANY has been induced to enter into this agreement and to make said conveyance.”